Robert E. OLIVER, et al., Appellants,

v.

STATE TAX COMMISSION
OF MISSOURI, et al.,
Respondents.

No. SC 82412.

Supreme Court of Missouri,
En Banc.

Feb. 13, 2001.

Kenneth M. Chackes, Gail A. Wechsler, St. Louis, for Appellants.

Jeremiah W. (Jay) Nixon, Atty. General, Gary L. Gardner, Huyen T. Pham, Assistant Attorneys General, Jefferson City, for Respondents.

Denise D. Lieberman, St. Louis, Amicus Curiae, for American Civil Liberties Union of Eastern Missouri.

WOLFF, Judge.

### Introduction

Robert E. Oliver, an atheist residing in Christian County, objects to a statutorily required form that contains the words, "So help me God."

The issue is whether Oliver's constitutional rights are violated by the phrase "So help me God" in the form of the oath or affirmation, prescribed in section 137.155.1,[1] for the required list of a taxpayer's real and tangible personal property. Section 137.155.1 allows the taxpayer either to swear or affirm the truth of the tax filing.[2] By allowing the taxpayer to "affirm" instead of swear, the law acknowledges the taxpayer's freedom of religious belief, consistent with article I, section 5, of the Missouri Constitution. The taxpayer, when opting to affirm, is free to delete the words that refer to God that may be inconsistent with his beliefs. Section 137.155.2 makes it a misdemeanor to refuse "to make oath or affirmation."[3] Thus, it cannot be read to require a reference to God. Because the statute allows Oliver the option to "affirm" rather than to swear—and, if he wishes, to cross off the references to God—the statute is constitutional, and it does not *require* Oliver to acknowledge the existence of, or belief in, a deity.

This controversy came to court because governmental authorities were insufficiently clear that the law respects Oliver's beliefs. In upholding the constitutionality of the statute, the trial court denied Oliver's prayer for declaratory relief. In affirming the trial court's decision as to the constitutionality of the statute, a clear statement is

1. All references are to RSMo 1994, unless otherwise indicated.

2. Section 137.155.1 provides:

 1. The oath to be signed and affirmed or sworn to by each person making a list of property required by this chapter is as follows:

 I, ............., do solemnly swear, or affirm, that the foregoing list contains a true and correct statement of all the real property and tangible personal property, made taxable by the laws of the state of Missouri, which I owned or which I had under my charge or management on the

first day of January, 19.... I further solemnly swear, or affirm, that I have not sent or taken, or caused to be sent or taken, any property out of this state to avoid taxation. *So help me God.* [Emphasis added.]

3. Section 137.155.2 provides:

 2. Any person who refuses to make oath or affirmation to his list, when required so to do by the assessor or his deputy, shall, upon conviction, be deemed guilty of a misdemeanor and no property shall be exempt from executions issued on judgments in prosecutions under this section.

made as to Oliver's right under Missouri law to make an affirmation rather than swearing an oath, and to delete the reference to God if it offends his beliefs. Because he is entitled to a limited declaratory judgment to this effect, the trial court's judgment is modified and such declaratory relief is granted. Rule 84.14. As modified, the trial court's judgment upholding the constitutionality of section 137.155 is affirmed.

Because this case involves the validity of a statute, this Court has exclusive appellate jurisdiction. Mo. CONST. art. V, sec. 3.

**Factual Background**

Oliver first noticed, in about January 1998, that his personal property tax form, which is prescribed by section 137.155, contains the sentence, "So help me God." Because this conflicted with his own beliefs, Oliver refused to sign it. Instead he wrote and signed his own affirmation— under "penalty of perjury"—and attached it to the personal property tax form.[4] Oliver then personally delivered the tax form, which included his own statement, to the Christian County assessor's office in January 1998. The assessor's office initially refused to accept Oliver's 1998 property tax list and referred him to the state tax commission. After Oliver contacted the state tax commission, a representative of the commission told the assessor's office to accept Oliver's form. Oliver resubmitted his property tax list, and the assessor accepted it.

After Oliver's submission of his 1998 property tax list, counsel for the state tax commission informed Oliver that the commission had issued a memorandum to all assessors in second, third, and fourth class counties stating that, beginning in the 1999 tax year, the commission would require the oath, as it appears in section 137.155.1, to be included on all property list forms submitted by counties to which the law applies. Because section 137.155.2 provides for criminal prosecution for anyone who refuses to make the required certification, Oliver asked the state tax commission whether he would be prosecuted for refusing to sign the property tax form containing the reference to God. Oliver said a tax commission representative told him that decision belonged to local prosecutors. Oliver then asked candidates for Christian County prosecutor whether, if elected, they would prosecute him for refusing to sign the property tax form with the reference to God. None of the candidates took a position on the issue.

In 1999, Oliver submitted his property tax form but again refused to sign it. This time, however, Oliver did not include his own affirmation. The Christian County assessor's office accepted Oliver's form, apparently without incident. Oliver was not prosecuted for refusing to make the certification to his list, and the statute of limitations for such a violation has now passed.[5]

Oliver and the forthrightly named Freedom from Religion Foundation[6] brought

4. Oliver added the following handwritten statement, which he signed:
It is my belief that requiring someone to take a religious oath violates the principal [sic] of separation of Church and State in the first ammendment [sic] to the constitution. I therefore cannot sign the oath on the form sent me.
In lieu of this I submit the following statement[:]
I do solemnly swear under penalty of perjury that the list submitted contains a true and accurate statement of all tangible personal property made taxable by the State of Missouri which I had under my charge or management on the 1st day of

January 1998. I further swear that I have not sent or taken any property out of the country to avoid taxation.

5. The statute of limitations for a misdemeanor is one year. Section 556.036.

6. We will deal only with Oliver's claim. The same relief is sought for the foundation. We are unable to ascertain from the record whether any individuals represented by the foundation, other than Oliver, residing in second through fourth class counties in Missouri, object to the oath form.

this action seeking declaratory and injunctive relief, which included in it a request for injunction against Oliver's prosecution and a declaration that section 137.155 is unconstitutional under federal and state constitutions. His claims under the First Amendment to the United States Constitution arise under 42 U.S.C. § 1983.

■ While Oliver currently has no need of an injunction, his obligation to file his list of taxable property is annual. Thus, there is a live controversy between Oliver and the state taxing authorities over this issue that is appropriate for declaratory relief pursuant to Rule 87.01.

### The First Amendment and "So help me God"

Oliver claims that including the phrase "So help me God" in the tax forms violates the establishment clause and the free exercise clause of the First Amendment to the United States Constitution, as well as the separation of church and state provisions of the Missouri Constitution. Oliver also claims the statute denies him equal protection of the law. These claims are addressed in order.

The oath in judicial proceedings came to western civilization from ancient Greece and has become part of our legal tradition with the English common law.[7] From earliest times, an oath was a pledge that invoked a deity, and breaking one's oath had super-natural or otherworldly conse-

quences.[8] To the Greeks, the oath served three functions:

> First, as a solemn promise or declaration to tell the truth; second, as an appeal to a god or gods who would guarantee the promise; and third, as a "religious sanction" in the nature of a threat of punishment if the oath taker committed perjury.[9]

At common law, the oath taker was deemed to be taking an oath to the Christian God.[10] With its religious significance, the oath was the centerpiece of an early common law proceeding known as "wager of law": an accused would take a solemn oath as to his innocence and then produce a number of oath-takers, usually 12, to swear that his oath was clean. THEODORE F. PLUCKNETT, A CONCISE HISTORY OF THE COMMON LAW 115–16 (5th ed., Little Brown & Co.1956).

The modern dictionary defines oath to include reference to a deity: "a solemn usu. formal calling upon God or a god to witness to the truth of what one says or to witness to the fact that one sincerely intends to do what one says...." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1554 (3d ed.1976).

When George Washington took the first oath of office as president in 1789, he recited the words prescribed in article II, section 1, of the United States Constitution[11] and then added these words, which

---

**7.** Jonathan Belcher, Note, *Religion–Plus Speech: The Constitutionality of Juror Oaths and Affirmations Under the First Amendment,* 34 WM. & MARY L.REV. 287, 291 (1992).

**8.** The Greek goddess Styx was the goddess of the river of death in the underworld. The gods swore their oaths beside the river Styx; violation of the oath would result either in the loss of one's immortality or being forced by Zeus to drink of the foul river and lose one's voice for nine years. Ryan Tuccinardi, *Styx,* THE ENCYCLOPEDIA MYTHICA, *available at* http://www.pantheon.org/mythica/articles/s/styx.html; Michael Dawson, *Styx (River)* THE ENCYCLOPEDIA MYTHICA, *available at* http://www.pantheon.org /mythica/articles/s/styx_river.html.

**9.** *See* Belcher, *supra* note 7, at 291, and authorities cited therein. Belcher says that the word "oath" was an appeal to a Greek god, "Oath." The dictionary cites ancient Germanic or Celtic sources for the word "oath." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1554 (3d ed.1976).

**10.** Belcher, *supra* note 7, at 292. Both the old and new testaments make numerous references to an "oath." *See generally* ILLUSTRATED DICTIONARY & CONCORDANCE OF THE BIBLE 742–43 (Geoffrey Wigoder et al. eds., 1986).

**11.** The President's oath, which is found in the last paragraph of article II, section 1, states: "I do solemnly swear (or affirm) that I will faithfully execute the office of President of the

are not found in the Constitution, "I swear, so help me God." [12] President Washington's words showed a belief in God and a prayer for His help. The first President's example has been followed by his successors. [13] In addition to the oath of our first president and all of his successors, the phrase "So help me God," and similar references to the Almighty, have been a part of our courtroom oaths, our laws, and other public rituals. *See generally Zorach v. Clauson*, 343 U.S. 306, 312–13, 72 S.Ct. 679, 96 L.Ed. 954 (1952); *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 214, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). [14]

The First Amendment, which has been made applicable to the states by incorporation into the Fourteenth Amendment, [15] provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." One might inquire whether the phrase prescribed by this statute constitutes an establishment of religion, that is, the prescription of religion by the state. Separately, one also might inquire whether the prescribed phrase infringes on the free exercise of religion, that is, the right to

believe and profess whatever religious doctrine one desires. [16] In the case of this oath, the two clauses invite similar analyses. The reasons that cause rejection of the notion that the oath's words are an establishment of religion also cause rejection of the argument that the Missouri statute impinges on Oliver's freedom to exercise his religious beliefs.

Rather than review the entirety of First Amendment law, we consider the cases most closely applicable to this oath.

■ The United States Supreme Court has never squarely ruled whether the words "So help me God," as used in section 137.155.1 or similar context, offend the constitution. The guiding principle is that no one can be required by the government to acknowledge the existence of, or belief in, a deity. *Torcaso v. Watkins*, 367 U.S. 488, 495, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961).

*Zorach v. Clauson* implied in *dicta* that the use of the phrase "so help me God" in courtroom oaths does not infringe upon the First Amendment. 343 U.S. at 313, 72 S.Ct. 679. The United States Supreme Court has also previously considered in

United States, and will, to the best of my ability, preserve, protect and defend the Constitution of the United States."

**12.** Steven B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 Colum.L.Rev. 2083, 2110 (1996) (citing Martin J. Medhurst, *"God Bless the President": The Rhetoric of Inaugural Prayer* 61 (1980) (unpublished Ph.D. dissertation, Pennsylvania State University)).

**13.** Epstein, *supra* note 12, at 2111.

**14.** *See also* Leonard W. Levy, The Establishment Clause: Religion and the First Amendment, 153–54 (2d ed. rev., University of North Carolina Press 1994). Levy notes that the Supreme Court has avoided decisions on whether the establishment clause is offended by witnesses in court swearing on the bible "So help me God," Presidential proclamations that invoke the name of God, the opening of the Supreme Court sessions, which asks that "God Save the United States and this Honor-

able Court," currency that carries the motto "In God we Trust," and the pledge of allegiance to "one nation under God." The Supreme Court, Levy notes, "has had the good judgment to decline deciding cases that question whether such practices violate the establishment clause. If that question has to be decided, those practices should be held unconstitutional as a matter of principle, although the rule *de minimis non curat lex* (the law does not bother with trifles) might justify a more practical judgment; the Court might hold that custom has so trivialized and secularized these practices that they do not violate the establishment clause. However, the Court has enough cunning to avoid rendering judgments in such cases. Principle, public opinion, and historical custom conspire to dictate a prudent abstention."

**15.** *See Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

**16.** *See, e.g., Employment Division v. Smith*, 494 U.S. 872, 876–77, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

*dicta* the national motto ("In God We Trust") and the Pledge of Allegiance (with the words "under God" added in 1954), and it "characteriz[ed] them as consistent with the proposition that government may not communicate an endorsement of religious belief." *Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 602–03, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *see also Lynch v. Donnelly*, 465 U.S. 668, 692, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring).

The important distinction observed by section 137.155.1 is between an "oath" and an "affirmation." An affirmation, according to Black's Law Dictionary (7th ed.1999), is "A pledge equivalent to an oath but without reference to a supreme being or to 'swearing.'" With this distinction established, what remains, then, is whether the statute's invitation to swear to God is constitutionally permissible.

■ The phrase "So help me God" in the oath required of admittees to the Alabama Bar was struck down in *Nicholson v. Board of Commissioners of the Alabama State Bar Ass'n*, 338 F.Supp. 48 (M.D.Ala. 1972). That federal court ruling followed an outright refusal of the Alabama Supreme Court to allow Nicholson to practice law unless he took the entire oath including the reference to God. *Nicholson* would be helpful only if the Court agrees with the memorandum issued by our state's tax commission that took a similar unyielding position. However, every word of this oath, including the reference to God, is not required by law.

Other cases have dealt with similar challenges. *United States v. Oliver*, 363 F.2d 15 (7th Cir.1966), held that the words "solemnly swear" and "So help me God" in the grand jurors' oaths do not amount to a requirement or an expression of a belief in God. *Id.* at 19. *Doe v. Louisiana Supreme Court*, 1992 WL 373566, *5 (E.D.La.1992), rejected a challenge to the phrase "In the year of our Lord" on a law license and notarial commission. The court upheld the use of these phrases as "ceremonial deisms," which the court said "should not be understood as conveying governmental approval of a particular religious belief." *Id.* at *6.

The state here urges us to adopt the ceremonial deism rationale. But we hesitate to label the phrase "So help me God" as a ceremonial deism.[17] Just as plaintiff Oliver and the Freedom from Religion Foundation find the use of "So Help me God" offensive because of its religiosity, some religious adherents just as fervently believe that an oath is not an oath unless it invokes the name of God. The latter view has support from the dictionary and from history.[18]

Though the government may not require a belief in God, and our institutions are secular, the name of God has always been in our public life, including the solemnization of oaths. At most, the invocation of the name of God in section 137.155.1 is a reminder of the solemnity of the occasion, which each person can interpret in accordance with his or her beliefs. It is indeed an invitation to express a belief in God. But because the option of affirmation is offered, it is equally an invitation not to express such a belief.

The First Amendment requires our laws to be neutral as to religion. Section 137.155 allows a person to "affirm" rather than to "swear." The statute does not require the invocation of God's name, and

---

17. There is an extensive discussion of the concept of "ceremonial deism" in Stephen B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism, supra* note 12, 96 Co-lum.L.Rev. 2083.

18. See the Webster's Dictionary definition quoted in the text, above, and cited in note 9,

and Belcher, *supra* note 7, at 289–94. There are some states that, in the 19th century, forbade a person from being a witness in a trial, or otherwise to take an oath, unless he or she professed a belief in God. *See, e.g., State v. Washington*, 22 So. 841, 842 (La. 1897).

if Oliver and others of similar beliefs wish to do so, they may delete the reference.

## The Missouri Constitution

 Oliver and the Freedom from Religion Foundation argue that the Missouri Constitution, in article I, sections 5 to 7, has a greater wall separating church and state and that, whatever the outcome under the First Amendment, the Missouri Constitution makes the reference to God unconstitutional. Oliver and the Freedom from Religion Foundation seem to read our constitution as being hostile to religion. But by text, history, and case law, it is not.

The Missouri Constitution provisions cited by the parties are as follows:

**Section 5. Religious freedom-liberty of conscience and belief-limitations.** That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no human authority can control or interfere with the rights of conscience; that no person shall, on account of his religious persuasion or belief, be rendered ineligible to any public office or trust or profit in this state, be disqualified from testifying or serving as a juror, or be molested in his person or estate; but this section shall not be construed to excuse acts of licentiousness, nor to justify practices inconsistent with the good order, peace or safety of the state, or with the rights of others.

**Section 6. Practice and support of religion not compulsory-contracts therefor enforceable.** That no person can be compelled to erect, support or attend any place or system of worship, or to maintain or support any priest, minister, preacher or teacher of any sect, church, creed or denomination of religion; but if any person shall voluntarily make a contract for any such object, he shall be held to the performance of the same.

**Section 7. Public aid for religious purposes-preferences and discriminations on religious grounds.** That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.[19]

From the state's first constitution of 1820 through the present sections quoted above, there has been the reference of section 5 to the "natural and indefeasible right to worship Almighty God according to the dictates" of one's conscience. This passage certainly reflects the historical fact that the majority of those who wrote and adopted our constitution felt free to express their own belief in Almighty God, which by text is a reference at least to the deity of monotheistic religions and histori-

---

19. Oliver also relies on article IX, section 8 of the Missouri Constitution, which contains the following language in the article devoted to public education:

**Prohibition of public aid for religious purposes and institutions.** Neither the general assembly, nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school, academy, seminary, college, university, or other institution of learning controlled by any religious creed, church or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any county, city, town, or other municipal corporation, for any religious creed, church, or sectarian purpose whatever.

Although the above-quoted section does not limit itself to education, it is in the article of the constitution concerning public education; moreover, to the extent that the above-quoted language covers areas other than education, it is redundant to the language of article I section 7, quoted in the text. Thus, article IX, section 8, quoted above, does not appear to add anything to support Oliver's claim.

cally to the Christian or Judeo Christian deity. Those who wrote and adopted our state's constitution expressed their belief in God, as well, in the preamble to each version of the Missouri Constitution. The present preamble to our constitution reads: "We the people of Missouri, with profound reverence for the Supreme Ruler of the Universe, and grateful for His goodness, do establish this constitution for the better government of the · state." Mo. Const. Preamble (1945).

But the Missouri Constitution, in article I, section 5, encompasses, as well, the freedom not to believe in God. So, in a manner that is similar to the statute at issue in this case, section 137.155.1, there is a reference to God but not a requirement that one express or hold a belief in God. This is consistent with the specific protection in article I, section 5, of the Missouri Constitution that "no person shall, on account of his religious persuasion or belief, ... be disqualified from testifying...." Because the filing of the taxpayer's property list under section 137.155 is to be signed under oath or affirmation, it is an act of testifying. Thus the statute's alternative of an affirmation is required under article I, section 5.

■ It is true, as the above sections make clear, that the Missouri Constitution deals with separation of church and state with greater particularity than the United States Constitution. *See, e.g., Gibson v. Brewer,* 952 S.W.2d 239, 246 (Mo. banc 1997). But our constitution cannot be read as being hostile to any particular religion or to religion in general, just as our laws ought not to be read as hostile to nonbelievers.

■ One point of difference in particularity with the United States Constitution is the focus on prohibiting state resources to the promotion of religion, which was added in the Constitution of 1875.[20] Specifically, Oliver refers to the first clause of article I, section 7, "That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion...." Oliver's argument is that the reference to a belief in God in the prescribed oath, in the promulgation of the form by the local and state taxing authorities, is a use of state resources in aid of a specific religious belief.

■ Public resources are expended in the taxing activity. Though it is said that the law does not bother with trifles,[21] in the area of religious beliefs the contentions made by the parties are taken seriously.[22] The statutory oath certainly offers the acknowledgement of a specific religious belief. But the statute is neither a requirement nor an exhortation to such belief.

The relationship of the Missouri constitutional provisions to religious freedom and religious discrimination was explored in *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), which may provide First Amendment guidance to interpreting the Missouri Constitution. *Widmar* involved a regulation of the University of Missouri Kansas City that denied access to public facilities at a state university for a religious group that wished to conduct meetings, which included religious worship and religious teaching. In support of the university's regulation, the state cited a "compelling interest in complying with the applicable provisions of the Missouri Constitution" quoted above. *Id.* The Supreme Court found it "unnecessary ... to decide whether, under the Supremacy Clause, a state interest, derived from its own constitution could ever outweigh free speech interest protect-

**20.** For historical context, see Steven B. Green, *The Blaine Amendment Reconsidered,* 36 Am.J.Legal Hist. 38, 43 (1992).

**21.** *Cf.* Levy, *supra* note 14.

**22.** *See, e.g., Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (where the Court took seriously the plaintiff's objection to the display of "Live Free or Die" on his state license plate).

ed by the First Amendment." The Court went on to hold that the university's regulation violated the principle that such regulation must be "content-neutral." *Id.* at 275–76, 102 S.Ct. 269.

In *Widmar* there unquestionably was the use of state facilities by a religious organization, which might violate a literal reading of the first clause of article I, section 7, of the Missouri Constitution. But the overriding requirement of the federal constitution is that the religious organization not be discriminated against on the basis of the content of its activities,[23] and in this case the Missouri Constitution is consistent with this principle.

State activities and religious beliefs will occasionally intersect, and references to God are found in many of our governmental activities. Rather than being able to cleanse our institutions of any religious suggestion or content, or to purge any incidental support that religious adherents might receive on a nondiscriminatory basis, the best that can be achieved in the context of this case is strict neutrality of the state as to those who express a belief in God and those who do not. The resolution reached here achieves that neutrality, and the reference to God in the statute is permissible.

**The Equal Protection Argument**

■ Oliver and the Freedom from Religion Foundation also argue that section 137.155 violates the equal protection claus-

es of the United States and Missouri constitutions. U.S. CONST. amend. XIV; Mo. CONST. art. I, sec. 2. They argue that section 137.155 imposes on Oliver and other residents of second through fourth class counties a requirement not imposed on residents of first class counties whose property tax certifications do not refer to God. *See* section 137.360.[24]

■ There is no equal protection violation here because the state is free to choose different forms of regulation in different classifications of counties, so long as there is no underlying discrimination against particular persons or groups that lacks a rational basis. *McGowan v. Maryland,* 366 U.S. 420, 427, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). The equal protection guarantee is not violated provided that all persons within the territorial reach of a specific statute are equally affected by the law; "it matters not that those outside the territorial reach of the law are free to behave differently." *Reeder v. Kansas City Bd. of Police Comm'rs,* 796 F.2d 1050, 1053 (8th Cir.1986).

Both section 137.155 and section 137.360 allow for non-religious attestations, an "affirmation," as in section 137.155, or a "certification," as in section 137.360. There is no substantive difference between these two terms.

However, Oliver asserts that he and other nonbelievers are still being treated dif-

---

**23.** The federal district court in *American Civil Liberties Union v. City of Florissant,* 17 F.Supp.2d 1068 (E.D.Mo.1998), relied in part upon the Missouri Constitution in enjoining the city's religious display of a creche at the Florissant Civic Center. The court of appeals reversed, holding that the city's Christmas display did not violate the First Amendment's establishment clause. The court declined to construe the state's constitution as forbidding the display and remanded the case to the district court with the suggestion that the matter be left to the Missouri courts to resolve. *American Civil Liberties Union v. City of Florissant,* 186 F.3d 1095, 1098–99 (8th Cir. 1999).

**24.** Section 137.360 is entitled "Form of Oath" but does not contain an oath, but rather a "certificate" to be signed by the resident of the first class county making a list of property. It is as follows:

I, . . . . . ., do hereby certify that the forgoing list contains a true and correct statement of all the real property and tangible personal property made taxable by the state of Missouri, which I owned or which I had under my charge or management on the first day of January, 19. . . . I further certify that I have not sent or taken or caused to be sent or taken any property out of this state to avoid taxation.

ferently because they would have to identify themselves as "nontheist" in order to obtain any accommodation, a requirement not necessary for first class county residents.[25]

There is no requirement that a taxpayer proclaim that he or she is a "nontheist," an atheist, or that he or she simply does not believe it is appropriate to the person's beliefs to swear before civil authorities. As the statute allows a taxpayer to "swear" or "affirm," the taxpayer's rationale for crossing out the reference to God is none of the state's business. Moreover, a person could sign the form as an affirmation and simply ignore, without deleting, the references to "swear" and to "So Help me God." In Oliver's case, however, he clearly has made it known that he is an atheist, which is certainly his right to proclaim. And it is, further, his right to delete the references to God when he signs the form. In any event, when a taxpayer opts to affirm, the words "So help me God" are surplus.

## Conclusion

The trial court correctly upheld the constitutionality of section 137.155. Oliver, however, is entitled to a declaratory judgment that he is free, under section 137.155 and article I, section 5, of the Missouri Constitution, to affirm rather than to swear his required property list and to cross off "So help me God," if he so chooses. Rule 84.14 authorizes entry of an appropriate judgment. The trial court judgment is modified to declare that Oliver is free to delete the reference to God contained in the form provided by section 137.155 and to affirm rather than to swear to the required property list. As modified by the declaratory relief that is granted

herein under Missouri law, the trial court's judgment is affirmed.

PRICE, C.J., LIMBAUGH, WHITE, HOLSTEIN and BENTON, JJ., concur.

---

**25.** It is not clear that residents of first class counties are entirely free of being required to take an oath. Section 137.150 authorizes assessors and others to be "empowered and authorized to administer any oath relating to the assessment of property required by this chapter...." This section might authorize an assessor in a first class county, if the assessor is not satisfied with the certificate that is filed, to require an oath. Any such oath would include an affirmation alternative, as does section 137.155.